Good morning, Your Honors. May it please the Court, I'm Mark Bodnar. I represent Kadeem Taylor. This morning, I wish to focus on the lack of individualized and particular suspicion that the police officers had to either conduct a sweep of the car that my client was a passenger in, that Mr. Taylor was a passenger in, or to have him step out of the car for purposes of conducting a frisk. In this case— Can I ask you a question? Yes, Your Honor. I've read all your materials, and setting aside whether the officer had a sufficient level of suspicion, in connection with a traffic stop, can't an officer always ask somebody to step out of a vehicle under Wilson without regard to any purpose or intent? That is correct, but there was— Before, even though he wanted to frisk him and was intending to frisk him, he never did. He never even touched him. He ran, and the probable cause for conduct thereafter came from the events that occurred after Mr. Taylor ran. So maybe you could address that part. Yes, thank you, Your Honor, because that is a point I wanted to address. The distinction is that even though hands were not laid on, after he directed Mr. Taylor out of the car, he told Mr. Taylor—and this is the additional intrusion and submission of two authority—he required Mr. Taylor to turn around, face the vehicle. He told Mr. Taylor that he had to put his hands on his head. This is Officer Johnson. Officer Rogers testified that he told him to put his hands on the roof of the vehicle. And thirdly, Officer Johnson told my client to spread his legs. So that was the additional intrusion that goes— Your argument that the directions to your client to get ready for a frisk was not just simply a Wilson exiting, but was an infringement beyond that that needed more justification. Exactly, Your Honor. It was an imposition of authority beyond having him step out of the car for safety reasons. Well, Wilson's exit is for safety reasons, isn't it? It is, but it doesn't authorize the officer to do what he was about to do to my client or what he actually did to my client by giving him these additional directions to submit to a frisk, which is what he fully intended and was going to do. And he took action towards doing that. It wasn't just his intention. The three actions I described to you earlier are the three things that went beyond what Wilson authorizes. My second question is, in the calculus that the officers took into account, could they consider the fact that these were both convicted felons? Okay, I'll concede that. He could consider that. Did he know that? I don't know that Officer Rogers knew that, Your Honor. Does the record tell us? I'm sorry, Your Honor? Does the record tell us if he knew that? I'm glad Your Honor asked. I don't believe that the record does reflect that. Well, he said he did. We went back to the check and he found out, number one, he had no license. Number two, they checked out the car ownership. There wasn't them. And number three, they were convicted felons. And he came back and he says he knew they were convicted felons. Officer Johnson did those checks, but I don't remember that he advised Rogers because Officer Rogers had already decided while these checks were being conducted that he was going to conduct the protective sweep. That's my recollection. Well, Rogers consulted Johnson to say, what do we do? And Johnson said, well, we could do a frisk. I'm sorry, Your Honor. It was the other way around. When Johnson came back from the car after he'd done his electronic check. With all due respect, Your Honor, I believe it was the reverse. Officer Johnson was the trainee. He went back to the car. He checked the computer, found there were no outstanding warrants. Did they consult after he came back from the car? They consulted and Rogers said to Johnson, I'm going to conduct a protective sweep. Forget about writing the summons. In fact, I believe it directed Johnson that he could stop writing the summons and to call for backup. And that's when Rogers went back to the car to watch the occupants of the car for purposes of waiting for their backup, which arrived about a minute later. And Officer Rogers, the court will remember, was the veteran. He was a nine year officer in the force. Now let me ask you, how should officers conduct themselves when they stop a car? They find that the driver can't drive the car away. And they find that the automobile is not their automobile. And that they're both convicted felons. I mean, he's going to have to get everybody out of the car. They're all going to have to be sat on the bank or wherever you are. This is in the parking lot of the apartment building. But it seems to me that this type of stop legitimately is going to anticipate a lot of arrangements of ordering these guys and moving them about and so forth, which would be far beyond just telling somebody to face the car and put your hands on the car, that type of thing, in terms of intrusion. They could have arrested him for driving. He could have arrested Officer Brooks for driving. Not without an arrest. They're going to issue tickets for driving without a license, but they can't let them back in the car. And so they're going to have to instruct them, you can't go back in the car. We're going to take the car. You can't drive it. Unless you've got a friend or a sister here or someplace that can come pick it up. And then they have to be, what are you going to do with them? I guess you let them walk somewhere. How are you going to assure that the car stays protected? Who's going to take the keys? These are more complex in this type of a stop, this particular stop. I mean, you could analyze it under a straight traffic stop on an interstate, and Wilson may protect this. But this is a little bit more complex. Had he had the suspicion that the government maintains that Officer Rogers had, I suppose they could have sought a warrant. I suppose they could have secured. We're talking about not what they could have done, what they did in this context. I just submit, Your Honor, that they could have left the car where it was. They could have returned the keys to the possessor of the car. That was Mr. Brooks. They leave it on the highway, and then the car gets stripped. It was in a parking lot at an apartment complex. It's in a rough neighborhood. They could get invaded. In other words, if the officers tell a guy he can't drive the car and they take the keys from him, they have to give them to somebody, don't they? I suppose they do. I guess that they could contact the registrant of the car. I don't know why they couldn't give them. They tow it away? I don't know that they'd have the authority to tow the car away. Maybe they had the responsibility to protect it. To protect it from? Vandalism. I don't know that the officer's authority extends to that, Your Honor. Private property? The officers would have to have reasonable suspicion that your client was engaged in criminal activity. That they were armed and dangerous, Your Honor, in this case. Engaged in criminal activity? Goes away? It has to be armed and dangerous? Well, I'd submit that that was what the officer believed was the case because he insisted he had to frisk these individuals. Right. And so what we have to assess is if there is a reasonable suspicion of that, right? That's correct, Your Honor. And so what facts do we have? We have the fact that your client was nervous. Yes. That apparently is a factor justifying police activity if you're nervous or if you're not nervous. But anyway, that's besides the fact. That is a factor, right? That's correct, Your Honor. Although it could go either way. That's what I just said. Yes, ma'am. It's 3 a.m., right? Yes, ma'am. It's in a bad neighborhood, right? That's arguable. Well. He said that it was a high-crime neighborhood officer. But they couldn't remember any crime. They have no substantiation. It was his bare conclusion. And we have this odd positioning of his legs. That's correct. The left leg elevated above his right leg while he leaned forward and he looked straight ahead. Yes, Your Honor. And so if we conclude that all of that gave them a reasonable articulable suspicion of criminal activity being a foot, then it's okay. And I don't believe that the totality suggests that. Right. Okay. I just wondered if there was, is there anything else that we, that's it, right? There's one thing I'd like to offer you from the record, and that is that, if I can find it, well, a couple of things. No, you put that together with the fact that they were unlicensed. They were driving a car which was not their own. They were convicted felons. These are all objective facts on which they could rely. Well, you always. And that he didn't know about. We'll go back and look at the record. Yes, ma'am. But you're saying that the way you remember the record, the police officer that conducted this didn't know about it. He didn't. That's the way. I don't remember Johnson communicating to him that they were felons. I don't remember that one way or the other on that either. I wanted to, in response to Judge Mott's question, in the appendix at page 148, Officer Rogers specifically retracts what he included in his police report to the effect that he saw my client, his nervousness was such that he saw his heart pounding through the sweatshirt. And I think. That's why I didn't mention it. Yes, ma'am. Okay. Very good. But all the same, I think. He really enhanced his notion that he did see his artery in his neck here pulsing. Your Honor remembers that, yes. But I think it gives context to where he was going with this. Remember, he scanned the car with his flashlight. I see my time's up, and I don't know that the Court. I think we've got it. Yes, ma'am. Okay. Thank you. I'd like to reserve two minutes. All right. Ms. Platt. Thank you, Your Honors. Good morning, and may it please the Court. Caroline Platt here for Mr. Brooks. And so I'm here to talk about the search of the car specifically. I'd like to start, Judge Niemeyer, with a point you made to my co-counsel, which is, I think, a factual misunderstanding of the record. The car was not registered to the apartment complex? No. It was registered at the bay. I thought there was a notion that there was the address on the car was not in that location where they had gone. That's right. So the car — So there was no notion like they were going home or going to a sister or whoever owned the car. So I have two points about that, Your Honor. All right. The car was not registered to the apartment complex where the stop happened. The cops were not aware that they did not — the car wasn't registered to them. You suggested that Mr. Brooks or Mr. Taylor was not the owner of the car. There's nothing in the record that suggests that. The car was not registered to that apartment complex. The car didn't live at the apartment complex. But there's nothing in the record — These guys own the car? There's nothing in the record about who owns the car or doesn't own the car either way. And, of course, it's the government's burden to introduce evidence. And so you cannot assume that they don't lawfully drive the car. I assume it was owned by somebody else. That's not in the record, Your Honor. So the other thing I'll say about that is that it is in the record that Officer Rogers testified that at some point during the traffic stop, a family member came out of — that was his word, it was either relative or family member — came out and talked to the cops. So the cops became aware during the traffic stop that either Mr. Brooks or Mr. Taylor did know somebody who lived there, and they learned that during the stop, just to sort of address what you talked about with my co-counsel. But otherwise, as I argued in our papers, the search of the — Was that before? The timing isn't clear, unfortunately. It would be hard to be before because everything was fairly quick in the beginning because during the course of the stop, when Taylor ran, they had to tackle him and bring him back and retrieve the gun, and then they had all the — I mean, it was within a few minutes, certainly, but the record isn't clear as to when this relative or family member came out. So as we argued in our papers, Mr. Brooks's — the evidence with which my client is charged was all found in the car, and our position is that the search of the car was illegal, both under Arizona v. Gant and under the Michigan v. Long line of cases. I thought Gant is the one they would rely on the easiest, isn't it? Well, our position, Your Honor, is that because, you know, Mr. Taylor, at the time of the search of the car, Mr. Taylor is a non-factor. Mr. Taylor is under arrest. He is in the squad car. He is in handcuffs. He's effectively gone. He's not literally gone, but he's effectively no longer an issue. He's under arrest. Now, just go back from after they found him with a gun and the way he conducted himself, he's — the two of them are together here at 3 a.m. One of them has a gun. He's subject to arrest now. He's under arrest. They've come out of the same passenger cabin. It seems to me at that point the passenger cabin is subject to recovery of evidence that could be lost. Well, under — so under the first holding of Gant, the passenger compartment can only be searched if it's within reaching distance of an occupant of the car. And because Mr. Brooks was handcuffed and so was Mr. Taylor, the search is illegal under Gant whereas previously it would have been legal under Belton seven years ago. But, of course, the search happened six years after Belton — or Gant was decided. With respect to the other holding of Gant about, you know, evidence in the car, so it's whether there's reason to believe that you will find evidence of the crime of arrest in the car. The crime of arrest is Mr. Taylor's illegal possession of a firearm. And they have the firearm. And it's not Mr. Taylor's car. You said you have to have one. Well, but the crime of arrest, Your Honor, is the possession of the gun that they have already recovered. And so I would submit that it is not reasonable to believe that there's evidence of the crime of arrest of Mr. Taylor in Mr. Brooks' car. There's just no reason to believe that. Could have had an extra gun. Extra gun? Ammunition? Why would Mr. Taylor keep his gun or ammunition in Mr. Brooks' car? It just says to me that this is not like a non-reasonable — Why are they in the car together? We don't know any of that. Maybe they are, you know, buddies. Maybe they're Cisco and Poncho and they always go together. You don't know who Cisco and Poncho are. None of this evidence is — this is one of — I apologize, Your Honor. Well, so this is one of the things I was going to say when I talked about reasonable suspicion under Long, and it goes to this as well. There is no evidence in the record as to the level of association between Brooks and Taylor either. No. All the officers know is that there are two people in the car. I mean, they've already got one. I'm not proffering this. And that person has a gun. Mr. Brooks could have been an Uber driver. I'm not proffering that. But I'm just saying there could be no association whatsoever. The Supreme Court has said many times that people in the car are presumed to be in a joint venture. They had to get in the car together under many doctrines involving searches and engagements with automobiles. A person, a driver, that's the whole reason that Wilson was justified. And all these other cases, the idea that when somebody gets into a car with somebody else, they can start with the presumption. It may not — what you say may be true, but they can start with the presumption they're together, they're operating together. And if we got a driver, I mean, a passenger who's got a gun and lies about it and is hunching down, and they look at each other and — Mr. Taylor looked at Mr. Brooks. There is no evidence that Mr. Brooks — Mr. Taylor looked at Brooks and delayed and sort of looked like consent. What do I do now? And there's no evidence that Mr. Brooks did anything back. So this is all suspicion as to Mr. Taylor, which brings me — But doesn't it indicate they were together? I mean, they were in the car together, but there's no — And more than that, he's looking at him for what purpose? Mr. Brooks didn't look back, Your Honor. So this is not suspicious as to Mr. Brooks. Individualized suspicion has to be just that, particularized as to my client. And my client — No, no. They know to justify getting evidence in the car. But — Because when they are trying to get evidence from the car in connection with Mr. Taylor's conduct, they uncover another gun, which is, of course, under the — under Mr. Brooks. Well, and, you know, Your Honor, when they do — which, of course, you cannot consider the later-found gun for purposes of this. But when they do find this other gun, they don't charge Mr. Taylor with that gun. So it's actually not evidence of the crime of arrest of Mr. Taylor. But what did they find during the search? And the question is, are they justified in conducting a cabin search? And, Your Honor, again, there's no evidence — so, for example, evidence that would have shown a closer association between Taylor and Brooks that is lacking in this record, the police did not know them. They did not know them to be associates. They — there was no — for example, in a hypothetical case, there could have been a be-on-the-lookout for two men in a white Infiniti car. Two strangers in the car at 3 a.m. in the morning? The police don't know how close their association is or is not. Didn't Taylor deny that the weapon that they found cast off on the ground was his? I believe that he did, Your Honor, but the police saw him throw it. Well, they saw him throw something. Why did they have to stop their investigation at that point? If he's denying it, they can certainly continue the investigation. They're more than welcome to go get a warrant, Your Honor, but the point is — Well, no. If Gant says that if there's some reasonable belief that there's further evidence of the fruits of the crime in the car, you've got a denial, you've got a defendant who chucked the weapon so it never was physically in his possession, you're suggesting that the police have to stop. Well, I have two points about that, Your Honor. First of all, if they saw him throw the gun, they did see the gun in his possession. If they saw him throw a, quote, dark object, which made a, quote, metal clanking sound, there is not evidence that they saw him throw a gun. Well, and the officer testified that the sound was consistent with the gun, and then they find the gun. And he says, no, that gun's not mine. The other thing is, Your Honor, so if you're suggesting that because Mr. Taylor denied the gun was his that they would find evidence of possession, like when they search a house, they look for mail, like, oh, this is your house, it's an illegal firearm, and it's not his car. He's not going to have a receipt for the illegal firearm, first of all. He might have ammunition. He might have ammunition. But not a – it's not his car. This is what gets me back to that. I think it's relevant that he's the passenger. I don't know it's not his car. How do the police know that? He's not driving the car. He's the passenger in the car. He told me that it could be his car. There's no evidence in the record as to who owned the car, Your Honor, but he's certainly not operating the car. But he could have stuffed – we know all the time that passengers stuff things underneath the seat and underneath the armrest and underneath the leg rest. I just – again, our position is that with respect to the crime of illegal possession of a weapon, it is not reasonable for the police to believe, when they already have the weapon, that there's going to be evidence of that crime in a car in which the arrestee is the passenger. Don't we have to put some common sense into law enforcement? I mean, sure, we have to enforce the Fourth Amendment and protect citizens. But here we have opened a can where there's criminal – serious criminal conduct going on with probable cause for arrest, and they now have a crime scene. And you're saying all of a sudden in the middle of the crime scene they have to stop everything and go downtown and get a warrant to look into the car where the guy exited from with – apparently with a gun and to see whether there's any other evidence to support a potential conviction? I mean, we're talking about certain rationality or practicality. And if we parse every action a police officer takes, which appears to be completely logical and reasonable – a reasonable person would do when you're investigating a crime scene, they clearly have a crime scene. Your Honor, I would concede that if, for example, they had arrested Mr. Taylor for Why? Because you would say he's already thrown away his drugs. So they couldn't think they'd be in the car because he wasn't driving the car. And he wouldn't leave his drugs in the car. Drugs and guns, Your Honor – I think drugs and guns are really different. I think drugs – you often find drugs secreted in different parts of a car, and you also have ledgers and scales. In Long itself, in fact – You have guns hidden all over the car, too. And in fact there was a gun hidden in this car. But again, Your Honor, I'd like to repeat, the gun with which Mr. Brooks was charged is not evidence of the crime of arrest of Mr. Taylor, and you know this because they charged Mr. Brooks with the gun and not Mr. Taylor. It happened. But so it shows you that they're not – On his side of the car. It could have been his car. That doesn't tell you a thing. Your answer – question has to address are they entitled to go look in the car in connection with Mr. Taylor's conduct. And if they are, then they're entitled to keep what they find, and they happen to find a Brooks gun. But the fact that it turns out to be a Brooks gun doesn't mean they couldn't have gone in there. I think it speaks to whether it's reasonable to believe that they'll find evidence of the crime of arrest, which is the language in the second holding of Gantt, which is effectively the Scalia concurrence in United States v. Thornton, Your Honor, which is the standard that the cops had to meet in this case. So I think it does speak to the standard of what I'll call Gantt II, the second holding of Gantt, because it's obvious that the first holding of Gantt in this case is not satisfied. I see my time's expired. I didn't have time to address Michigan v. Long, but I would like to note that we firmly believe that there was no reasonable suspicion as to Mr. Brooks and that all of the suspicious facts about Mr. Taylor should not impute to Mr. Brooks. You don't think that gun gave reasonable suspicion? Not as to Mr. Brooks.  Well, that's after the sweep, Your Honor. Well, sure. So before the search of the car. They didn't engage in the search in connection with Mr. Brooks. They engaged the search in connection with Mr. Taylor. Well, Mr. Taylor was already under arrest, Your Honor. So at the time they searched the car. No, but I'm saying if Taylor, if they searched the car properly for Mr. Taylor, you'd concede then everything falls in place. Under Gantt? Yes. That's right. I'm talking about Michigan v. Long now, which is the government's other argument for why the search of the car was legal. So I would just like to say that we firmly believe that under United States v. Black and United States v. Neely, that once Mr. Taylor was under arrest, there was no reasonable suspicion for the sweep of the car because Mr. Brooks had no suspicious facts for reasonable, articulable, individualized suspicion. Okay. Thank you, Ms. Platt. Thank you, Your Honors. Mr. Schiller. Good morning, Your Honors. David Schiller for the United States. With regard to this matter, we ask that the court affirm the district judge's denial of the suppression motion. Based on the decisions of this court and George and Robinson, there is no question the district court correctly found that there was reasonable suspicion that a Let me ask you a question I asked Mr. Bodner, and that is, he suggests that this was not protected by the Wilson doctrine of having somebody exit because it wasn't just merely an exit. It was an exit with instructions to put your hands on the car and stuff. What's your response to that? I think the first is that it ignores what happens every day in a Wilson step-out direction, and that is the officer says, please get out of the car and stand over there, away from the car or at the That's not what happened with him. Excuse me? That's not what happened. No, I agree on that. But the first point to answer Judge Niemeyer's question is that Their argument is that the directions, in addition to get out of the car, the directions of where to go and how to posture yourself, sit down on the grass is equivalent to putting your hands on another direction. In other words, there are intrusions in freedom. The intrusion that's justified and found reasonable in Wilson does not restrict the officer giving further directions as to once he gets out of the car. On the side of the highway, they give instructions as to be safe, go stand behind the. But a frisk is more intrusive than go sit somewhere. Absolutely, Your Honor. And I don't reach, I don't go that far in my initial response to the thing. That's the issue, I think. No, and as to the intent to do the frisk, that's judged by the facts that you all went through at some length in the questions here, and I can go through again. But it's basically that there was ample, as the district court found, evidence. My question, I just wanted to stick one second with it. Yes, sir. My question is that no frisk was conducted. Oh. And so on Taylor. He intended to, obviously. He was prepared to, but the guys then ran. And so if you examine this as a Wilson exit, without the need of exploring some reasonable suspicion, is the ordering him to put his hands on the car any different on the Fourth Amendment intrusion than telling him to sit on the bank? And it's the government's position that telling somebody to put their hands on the car or on top of their head, because I think the officers were in dispute on that, and lean towards the car and put their legs apart, that that's not more of an intrusion than go sit by the side of the road? Oh, there surely is. That's more intrusive. That's why I say I was just trying to give the first. I actually have five answers to that question. It's a theoretical question about how this case can or should be addressed. And Wilson provides some latitude in the case in getting him out. But they argue that the instruction is a further intrusion. Absolutely. And the interesting thing about this case and the challenge about this case is that we have a blending of all these issues at 3 a.m. that I have not seen in many, many years of looking at these kind of cases. But you start. The second thing I asked him, I'm curious about the factual circumstance, and I just don't recall. Johnson did learn, he said, that these were convicted felons. Yes, Your Honor. Did he communicate that to anybody? I believe he communicated it to Rogers. When they finally apprehend Taylor after the chase. Yeah, but we're talking about before. Yes, but he knew that he was a felon. And when they retraced the step, Johnson and Rogers. How did they know? How did Rogers learn? How did Rogers know? When did Rogers learn? My recollection is that Johnson, when he came back after his first time to check Brooks' I.D., had confirmed. No, he confirmed it. When did he tell Rogers? When he came back after his initial. I guess we can. And you think there's something in the record that's going to tell us that? That is my recollection, Your Honor. I was flipping through my own notes, and I regret. You can't really put your hands on it right now. I couldn't find the page reference. But I have a fixed opinion that they knew that both the passenger. If Rogers didn't know, maybe proceed there, because that's worst case for you, right? Okay. That's fine. That's fine. So then go forward. Okay, and with regard to what we have here, the circumstances as to the reasonable suspicion are actually different pieces, but they go to a joint endeavor of Brooks and Taylor. The circumstances you have here are first the circumstances of the stop itself, in which you have speeding and then turning on the emergency lights and or the siren, and then Brooks driving the car another 50 to 200 yards before stopping the vehicle in an apartment complex that he does not live in and that the car is not registered to. There was some testimony by Rogers about seeing some odd movements. It was all back and forth as to whether that related to a cigar or something at the evidentiary hearing. But in any event, so that's what the first start is, and that's all Brooks's behavior at that point. Johnson goes up to the driver's side, finds out that Brooks doesn't have a license, and then subsequently goes back to his car in the process of ---- Johnson apparently told Rogers that he was going to be ---- that Mr. Brooks's license was suspended with notice. Yes, Your Honor. It doesn't look like he told him anything else. Somewhere ---- But it was Johnson, I see here, it was Johnson who told him to exit, not Rogers. That is correct. The circumstance there ---- On the page before it says he learned, he confirmed that they both had prior felony convictions. I thought that the representation from the other side that was that it was ---- That's what I said, yes. That it was Rogers who had asked him to exit. And I thought you got along with that. If I did, it was in ---- It says, this is Johnson's testimony, he asked them both to step out. Did you have concern as to them being armed? Yes, sir, I did. Yes, and he says elsewhere in his testimony that it was based on what Rogers told him. Well, I'm not talking about based, I'm trying to see who's functioning with what knowledge. Oh, oh. Well, this fact is that Johnson asked them both to step out. I thought Rogers was back in the corner of the car at that point in time. At all relevant times, Rogers is off on the passenger side of the car and behind keeping an eye on Taylor, while Johnson gets the information. Well, Rogers says he instructed Johnson that I wanted, I instructed Johnson that I wanted to do the protective sweep. And at that point, well, anyway, we'll figure it out. The circumstance here is that the decision to do the sweep and or frisk was Rogers, that he made that decision based on what he observed primarily of Taylor. And you made the mention of the posture and all of that. Right. And in particular, especially based on Robinson, the crap look as it's referenced in Robinson, you know, he sees Taylor do a lot of odd things that raise his valid concerns. Instead of asking him to step out of the car, he goes and says, do you have a gun? At that point, Taylor looks at Brooks, then looks back straight ahead and then says no without looking at the officer, which troubles him a great deal. But that's quintessential, the sole factor in. It looks to me like the scenario we were given by the other side is quite a bit different here. And on page 106, this is Johnson testifying. He said, I asked, this is, again, second time, I asked him to step out. He was very slow, hesitant. When you're asked to step out of a vehicle, you open. And then he told him about, he did comply and step out. Once he stepped out of the vehicle, you instruct him to put his hands on his head, correct? Yes, sir. I instruct him to put his hands around his face and vehicle and so forth. Did Taylor begin to turn around before he fled? Yes, sir. And then before he turned around, before he did it, he fled. But this is all Johnson doing this. Johnson? Johnson was the one that knew he was a convicted felon, too. Correct. But I tell the court that the confusion is because Rogers testifies it was his decision to do this. And so that's why it got all melded in together. Okay, my apologies. The bottom line here is Rogers, the more experienced officer, based primarily on what he saw of Taylor's odd behavior and his specific question of Taylor, told Johnson, we need to check for guns. Johnson knew all of this other stuff. Yes. Johnson had gone and checked the records. And Johnson said he suspected he had guns. Johnson had that suspicion, but somewhere, in fairness, in Johnson's testimony, he says a lot of his conclusion was based on what Rogers told him he had observed about Taylor. So he was relying on the more experienced officer's opinion, and Rogers had already told him, I think we need to do a search, and backup was called at that point, while Johnson is busy with the ticket process. But to answer Judge Mott's, Rogers made the decision to do the frisking and communicated that to Johnson. Johnson asked Brooks to step out, did the frisk, then went around and asked Taylor to get out, and the quote that you read. So Johnson was actually doing the thing while Rogers is off on the passenger side watching it occur. And then to go back to your initial question, once you get through all of this reasonable suspicion and that they think there's a basis to do a frisk, as Judge Hudson concluded, regardless of what their intent was, and the subjective intent under Bullock doesn't control in any event, once Taylor takes off, as Judge Hudson concluded, that changed circumstances drastically. And indeed it did. And in the evidentiary hearing below, the whole issue was not so much the propriety of a frisk per se, but that taking off and then coming back, and with a gun. But he didn't get frisked. I'm sorry? He didn't get frisked. Exactly. So it's not, okay. My point is, there wasn't an extensive discussion with the district court because there was no frisk. And because there was no frisk, the question was, for everyone in that evidentiary hearing, I can tell the court, because I was there, was basically that there was probable cause when they brought Taylor back after the apprehension, and after they had recovered the gun, after retracing the chase, could they then go into that car and look for other evidence? And if I may address Ms. Platt's argument with regard to that, the offense of arrest as to the second ground of Gant is well and truly met here. And I think you all really touched on this. What you find in these cases, what we would look for, once Mr. Taylor certainly denies the gun is his, then we're looking in the passenger area first for ammo that matches the gun that was found, matches the caliber of the gun that was found in the retrace. Look for receipts, look for a box. If he had admitted that the gun was his, would that change the calculus? They still have the right to go in and get the evidence. It would change the calculus in the sense of... You'd still be talking about receipts. Yeah, and you would still look, you know, if it's a .32 and you find .32 ammunition loose on the floor at the feet where the passenger was, I mean, these are cases I've had, not this case, but, you know, that's corroborating evidence that the gun that they found over here was, in fact, his, because he's got ammunition in his feet that match it. You know, if there had been another gun under Taylor's seat, someone raised that point as well, a second gun in the area, that would be relevant to Taylor's possession of the gun. As I say, I've had cases with the box itself that the gun was purchased in, other attributes of gun possession. In any event, we don't have them, because it strikes me that if he said, oh, yes, that's my gun, and here's the... I mean, I still think you would be able to go in, even if you said, this is my gun, and here's the box for it, here's the receipt, here's some bullets, you could get some more bullets in another box. Right, right. In another gun. Regardless of how much he gives up, Judge, at that point, the officers are still properly going in. They have probable cause at that point to go in and look for evidence with regard to the gun possession, period. And I just can't conceive of any argument against that. And once you get to that point, as Judge Hudson, I mean, he made 12 legal conclusions on all of these questions, but the bottom line for the district judge was once the gun is retrieved and they bring him back to the car, there is probable cause to search the passenger compartment, and that's all they properly did in this case. And while it's an interesting issue as to if they had done a frisk, would that have made a difference? And especially, as we know, this case wouldn't have gone the way it did because the gun was in. The evidence and the like most favorable to the government is that the gun that was tossed down and found was actually in the waistband area that he appeared to be leaning over and protecting, which troubled Officer Rogers to begin with. So had there been a frisk, that gun would have been found at that point on his possession. So, you know, the whole thing changes once without a chase. As with any hypothetical. Yeah, and I don't mean to stumble all over this. It's just that once you change the facts, then this mix of all these different issues changes with it. Now, but my point is that the district judge's prime decision basis was that Taylor ran. There was no search. There was no frisk. They caught him. They saw him toss something with a metallic clank. They went back and retraced it. Lo and behold, they found a gun there. Taylor then denies it's his gun. They have the right to bring him back to the car and search at least the passenger compartment, which is all they did. And look for other evidence. They found the other gun, which is a .40 caliber under Brooks's floor mat. But that's a valid search. Does the record show who owned the car? You know, I thought it – I'm going to beg off again. I do know, by the way, who those characters are. But I cannot remember. I thought it was the girlfriend of Brooks or a sister. The problem is I read all of the investigative reports, too, and I don't want to misstate the record there. Anything else? Well, Your Honor, except with regard to the standards of review, of course, are highly in favor of the government. And the point you raised, and I want to touch on, is the point you make about common sense of the officers. So many of the cases talk about crediting the practical experience and knowledge of these officers. If you start parsing out this kind of thing on issues of did he look long enough at Brooks or did Brooks say something back or give an aw shucks look back to him, parsing that out at 3 a.m., that's just no common sense whatsoever. These officers are doing a hard job at night in a difficult area. And there are the factual conclusions of the district court give more than, well, as the district court characterized it, ample evidentiary basis for their reasonable suspicion. And common sense makes it clear that the district court was correct in its conclusions. I think that, you know, there is one other side issue that I think. You don't have to use it all if you don't need it. No, no, and that's what I've been told so many times. But there is one other issue that may come up in rebuttal, and that is the issue of whether or not Mr. Brooks has a right to argue anything with regard to Mr. Taylor. And the decision in the Baker case makes it very clear that he has no right to claim any problems with regard to Taylor as a basis for his argument. And we make that argument in the briefs. With regard to that, unless the Court has any other questions. There. Thank you, Mr. Schiller. Thank you very much. All right. We'll hear from Mr. Bodner in a couple of minutes. I think I might be able to help with the factual situation a bit. Johnson did the check in the car on the computer. Johnson was present when Mr. Taylor stepped out, and Johnson was next to Mr. Taylor when he stepped out of the car. It was Rogers' decision communicated to Johnson. So we said. Okay, good enough. So I think it's worthy of the Court to note that the appendix page 99, at the time that Johnson had Mr. Taylor step out of the car, he said, he testified, that he had no reason to believe that Taylor had committed any criminal offense at the time he asked him to leave the car. Now, Rogers is the one who wanted to conduct the sweep, and I think it's significant to know that they flashed the car with the flashlights. They surveilled it. They didn't find and you didn't hear any evidence, and there's no evidence in the record to indicate that there are any bulges, any containers, any furtive gestures, any sudden gestures, anything to call their attention to this, that there really is, other than the interpretation of Mr. Brooks looking at Mr. Taylor, looking at Mr. Brooks and then looking straight forward and saying no. It's more complex than that. He gave an extensive description of a person who was not conducting himself in a normal fashion. He was huddled over. He looked like he was protecting. He was sweating. He was pulsing. He looked at Brooks when they asked him if he had a gun, and he looked straight ahead, and all this conduct looked very defensive, and while everybody's going to be under some kind of defensiveness in that circumstance, this is an experienced officer, and he was making a judgment, and he concluded there was something amiss, and, of course, he was right about it at that point. He cited evasive factors. There was no evasion. The car stops within seconds. They didn't get out and all these things. In other words, the conduct was not if we'd pulled up in a car and asked you as a passenger to get out how you would have conducted yourself. I'm not sure, Judge. Seriously. Did they frisk you before you came in? I'm sorry? Did they frisk you before you came in here? They made me go through a detector. A detector. All right. So, I mean, people travel at night. I understand, and we have a red light now, and why don't we finish up with Ms. Platt. Thank you. Thank you, Your Honors. I would like to note, first of all, that much as Officer Rogers testified on page 124 of the joint appendix that he was the one who decided to frisk both men and conveyed that to Rookie, I think you said it was his first or second week on the job, Officer Johnson, at the same time, Officer Rogers decided that they were going to search the car. The frisk and the car search decision was made simultaneously. We're trying to look at the objective evidence and see whether it's justified what was going on. Clearly, they suspected there were guns and they needed to conduct a frisk, and the question isn't whether that subjective conclusion was justified. The question is what they did to his freedom. Correct. And as Judge Hudson actually sort of suggested, although did not hold at the district court, as to Mr. Brooks, it's a very good argument that the frisk was unconstitutional, but there was no evidence turned up in it, so we have no basis to challenge the frisk of Mr. Brooks. There's no evidence to suppress, right? And the only thing as to Mr. Brooks that changed was Mr. Taylor's unfortunate actions, which brings me back to the point I was trying to make before, which is that as to Mr. Brooks, there was no reasonable suspicion at any point. He was compliant. He volunteered that he didn't have a license. What is that doesn't advance the ball at all. They don't even claim that. What they claim is that the gun found in the car implicated Brooks, and they claim their right to the gun was in connection with the search for Taylor's conduct. The government has argued at length reasonable suspicion as to my client, Your Honor. So if you want to agree with me off that, that that's wrong, I'm happy to cede that. But they have argued suspicion as to Brooks, which we contend is completely false and should be rejected. With respect to Gantt II, as I was saying before, I do not believe that there's reason to believe that an illegal felon in possession of a firearm, which is what Mr. Taylor was, that there's reason to believe that you're going to find a receipt or a box from Wal-Mart or anything else in the car of his friend that he's riding in. But ammunition is very common. We have a lot of cases in the center console, there'll be ammunition and rolled up money often. In someone else's car, Your Honor. Even drugs in there. They're not allowed to look for the drugs because this is not a drug violation. But this is what we find regularly in these searches. But as Your Honor just acknowledged, that's not evidence of the crime of arrest. All the police can decide to look for is evidence of. Ammunition. But right. But any drugs and cash and other things, that's not what they're allowed to do under Gantt. The man's denying it was his gun, so they're going back to try to link it up. I mean, this is. That's right. Come back, Your Honor, to the fact that it wasn't. Is that unreasonable for an officer to do that? We submit that it is, Your Honor. Okay. He's a passenger in a car. You don't have any idea what his connection is to the car or to the other person. He was in the car. It's the police's, it's the government's burden to show, you know, that a warrantless search is reasonable. And they didn't proffer any of that evidence to show why it was reasonable to believe that they would find any of that in this car that they don't understand Mr. Taylor's connection to. And so, in the end, they have violated Mr. Brooks's rights as the driver of the car and the possessor of the car by, because it's reasonable to believe that they're going to find some belongings of Taylor in the car, which, in the end, they did not find. Which, while, is, I think, you know, reasonable to consider as part of the analysis, Your Honors. Okay. So we would ask the Court to reverse. Thank you. I'm fine. We can move forward. That's pretty much it. Do you want to move forward? Is it okay? Yeah, sure. All right. We'll come down and greet counsel and proceed on to the next case. I don't think we're going to.
judges: Paul V. Niemeyer, Diana Gribbon Motz, Albert Diaz